IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| W. Edward Anderson, Steven D. | ) | |
| Cogburn, Darryl J. Hart, Carol L. | ) | |
| King, David N. Wilcox, Stephen L. | ) | |
| Pignatiello, and Weststar | ) | |
| Financial Services Corporation, | ) | |
| | ) | C.A. No. 1:12-156-HMH |
| Plaintiffs, | ) | |
| | ) | |
| G. Gordon Greenwood, | ) | |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| The Cincinnati Insurance Company and | ) | |
| The Federal Deposit Insurance Corporation, | ) | |
| as Receiver for the Bank of Asheville, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the parties' cross motions for summary judgment. For

the reasons set forth below, the court grants the Plaintiffs' motion for summary judgment[1] and

denies The Cincinnati Insurance Company's ("Cincinnati") motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action in which the Plaintiffs, former directors of the Bank of Asheville

("Bank"), are seeking, in part, a declaration that the "Financial Institutions Blue Chip Policy"

("Policy") number BCP 873 70 58 issued by Cincinnati for the period of November 3, 2007 to

November 3, 2010, requires Cincinnati to pay for defense costs and any settlements or

---

[1]Intervenor Plaintiff G. Gordon Greenwood ("Greenwood") has joined in the Plaintiffs'
motion for summary judgment.

1

judgments entered in the underlying action against them, <u>Federal Deposit Insurance Company ("FDIC") v. Greenwood et al.</u>, No. 1:11-337-HMH ("underlying action"). The Bank is owned by Weststar Financial Services Corporation ("Weststar").[2] In the underlying action, the FDIC alleges claims for negligence and breach of fiduciary duty pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA). The underlying lawsuit was filed December 29, 2011. In addition, the Plaintiffs allege a claim of anticipatory breach of contract and for reformation of the Policy.

All of the Plaintiffs served on the Bank's loan committee during the time period in question. Intervenor Plaintiff Greenwood was the President and Chief Executive Officer ("CEO") from January 2000 to August 13, 2010. On December 30, 2011, the Plaintiffs provided Cincinnati notice of the December 29, 2011 complaint. Cincinnati denied coverage for any costs, settlement, or judgment for the underlying action.

This action concerns the Directors and Officers Liability and Company Coverage provided under the Policy. (<u>Id.</u> Ex. 2A (Policy).) The Policy provided coverage from November 3, 2007 to November 3, 2010. Additionally, the Policy provided that Cincinnati

> will pay on behalf of the "directors and officers" all "loss" which they shall be
> legally obligated to pay, except for such "loss" which the "company" actually pays
> as indemnification, resulting from any "claim" first made during the "policy
> period" or any "extended reporting period" included in or endorsed to the policy,
> for a "wrongful act."

(<u>Id.</u> Ex. 2A (Policy Part I, Section I - Insuring Agreements, A).) According to the "Extended Reporting Periods" section of the Policy:

---

[2]For simplicity, the court will refer to the Bank and Weststar collectively as "Bank" throughout this opinion.

D.      A 60-day Basic "Extended Reporting Period" is automatically provided without additional charge.  The Basic "Extended Reporting Period" starts immediately after the end of the "Policy Period" of the applicable Coverage Part.

* * *

E.      A <u>12-month Supplemental Extended Reporting Period</u> may be available, but only by endorsement and for an extra premium charge.  <u>The supplemental Period starts when the Basic Extended Reporting Period, as set forth in Section XVIII.D. above, ends.</u>  The first "named insured" must give us a written request for the Supplemental Extended Reporting Period within 60 days of the termination of this insurance.  The Supplemental Extended Reporting Period will not go into effect unless the first "named insured" pays the additional premium promptly when due.  If the Supplemental Extended Reporting Period is in effect, we will provide a Supplemental Aggregate Limit of Insurance, but only for "claims" made during the Supplemental Extended Reporting Period.

* * *

The additional premium will not exceed 200% of the expiring annual premium for the applicable Coverage Part.

The Supplemental Extended Reporting Period endorsement shall set forth any terms that differ from the basic coverage applicable to the Supplemental Extended Reporting Period.

(Compl. Ex. 2A (Policy Part V, Section XVIII - Extended Reporting Periods, D-E) (emphasis added).)  Pursuant to the Policy, the Bank could request the Supplemental Extended Reporting Period "within 60 days of the termination of the" Policy.  (<u>Id.</u> Ex. 2A (Policy, Part V, Section XVIII – Extended Reporting Period, E).)  However, prior to the end of the Policy Period on November 3, 2010, the Defendants purchased by way of endorsement a 12-month Supplemental Extended Reporting Period ("Endorsement") for an additional premium charge of $32,255, which represents 200 percent of the annual premium.  For the additional 12 months, Cincinnati charged the bank the maximum premium for the Supplemental Extended Reporting Period

3

permitted under the Policy.  Under the Policy, claims could be made through January 3, 2011 (Policy Period end date of November 3, 2011 plus 60 days).  By purchasing an additional 12 months, the Supplemental Extended Reporting Period should have been dated January 3, 2011 to January 3, 2012.  However, the Supplemental Extended Reporting Period Endorsement states in its "Schedule" section that the Supplemental Extended Reporting Period is "11-03-2010 – 11-03-2011."  (Id. Ex. 2A (Policy Endorsement).)  Further, the Endorsement provides:

> A Supplemental 'Extended Reporting Period' is provided as described in SECTION XVIII- EXTENDED REPORTING PERIODS of the GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY.

(Id. Ex. 2A (Policy Endorsement) (emphasis in original).)  The Endorsement is silent regarding the 60-day Basic Extended Reporting Period provided in Section XVIII of the Policy.

R. Stanford Webb Agency, Inc. a/k/a Webb Insurance ("Webb") assisted the Bank in purchasing the Supplemental Extended Reporting Period.  David Mann ("Mann") and Lindsey Strong ("Strong") are both employed by Webb and had contacts with the Bank and Cincinnati related to the purchase of the Supplemental Extended Reporting Period.  On August 23, 2012, Ted W. Doughman ("Doughman"), Assistant Vice-President and Senior Underwriting Manager for Cincinnati, informed Mann via email that because of the Bank's negative second quarter earnings report Cincinnati would not renew the Policy.  (Pls. Mem. Supp. Summ. J. Ex. 8 (BOA-Webb 52).)  A written notice of nonrenewal was sent to the Bank and Weststar on August 25, 2010.  (Cincinnati Mem. Supp. Summ. J. Ex. 34 (Notice of Nonrenewal).)  Mann contacted Randall C. Hall ("Hall"), the Bank's CEO, and informed him of Cincinnati's decision to not renew the Policy.  (Pls. Mem. Supp. Summ. J. Ex. 5 (Mann Dep. at 13-14).)  On

September 16, 2010, Hall requested that Mann contact Cincinnati requesting "a 12-month tail onto our existing D&O policy" and inquire what the premium charge would be. (Id. Ex. 5 (Mann Dep. at 14) & Ex. 9 (BOA-Webb 74).) Mann forwarded the request to Cincinnati.

Doughman states in his affidavit that, in response to Mann's inquiry about the extended reporting period, he telephoned Mann and explained that the Bank could do nothing and the 60-day Basic Extended Reporting Period would trigger automatically or the Bank could purchase a 12-month Supplemental Extended Reporting Period. (Cincinnati Mem. Supp. Summ. J. Ex. 5 (Doughman Aff. ¶ 10).) However, Doughman submits that he informed Mann that Cincinnati would not agree to provide more than a total of a 12-month extended reporting period. (Id. Ex. 5 (Doughman Aff. ¶ 10).)

On September 20, 2010, Doughman emailed the following to Mann:

#BCP8737058
Expires 11/3/2010
Hi David,
We are offering a 12 month Extended Reporting Period as follows:
1. Effective 11/3/2010 to 11/3/2011.
2. A/P = $32,255 due 11/3/2010.
3. Premium is fully earned effective 11/3/2010.

(Id. Ex. B (Doughman Aff. ¶ 12 and Ex. 35 thereto).) On September 23, 2010, Mann forwarded Cincinnati's offer to Hall stating that it "merely extends the reporting period for claims to be made." (Pls. Mem. Supp. Summ. J. Ex. 12 (BOA-FDIC 5-6).) Mann also testified that the 60-day Basic Extended Reporting Period and the 12-month Supplemental Extended Reporting Period were separate and both applied to provide a total of 14 months of extended reporting coverage. (Id. Ex. 5 (Mann Dep. at 33, 39, 118).) On October 19, 2010, at the Bank's Board of Director's meeting, the offer was reviewed. (Def. Mem. Opp'n Summ. J. Ex. N (BOA-FDIC

65-72).) Mann and Hall attended the meeting and Hall testified that the Board believed that it was purchasing a 12-month Supplemental Extended Reporting Period in addition to the 60-day Basic Extended Reporting Period. (Pls. Mem. Supp. Summ. J. Ex. 4 (Hall Dep. at 157).) Hall instructed Mann to "execute the ERP" on October 20, 2010. (Id. Ex. 15 (BOA-FDIC 73).) The Board approved the offer on October 26, 2010. (Def. Mem. Opp'n Summ. J. Ex. O (BOA-FDIC 93).) Strong instructed Doughman to bind the coverage on October 27, 2010. (Pls. Mem. Supp. Summ. J. Ex. 16 (BOA-Webb 124).) Cincinnati forwarded a copy of the Supplemental Extended Reporting Period Endorsement to Webb in November 2010. Strong and Mann testified that the Endorsement schedule did not raise any questions because the 12-month Supplemental Extended Reporting Period was separate and distinct from the 60-day Basic Extended Reporting Period and the Endorsement was silent regarding the 60-day Basic Extended Reporting Period. (Id. Ex. 5 (Mann Dep. at 33, 39-40) & Ex. 6 (Strong Dep. at 12, 19).) Strong forwarded a copy of the Endorsement to Hall on November 23, 2010.

On July 23, 2012, Cincinnati moved to dismiss arguing as follows:

The Plaintiffs' Complaint fails to state a claim to relief that is plausible on its face and should be dismissed because: (1) the Policy extends coverage only to "claims" that are first made during the "Policy period" or "claims" that are made and reported in writing prior to the November 3, 2011 expiration of the Extended Reporting Period, and the FDIC Complaint was filed after the Policy and the Extended Reporting Periods expired; (2) the Policy extends coverage only to "claims" made against an "insured" and the October 27, 2011 letters are not

"claims";[3] and (3) Plaintiffs do not and cannot plead any cause of action for reformation.

(Cincinnati Mem. Supp. Mot. Dismiss 4.)  After briefing, the court held a hearing on the motion to dismiss on September 25, 2012.  At the hearing, the court found that the terms of the Policy and Endorsement were inconsistent and ambiguous regarding Section XVIII - Extended Reporting Periods.  (H'rg Tr. 41.)

The court permitted the parties to complete expedited discovery and provided a deadline for filing cross motions for summary judgment on whether the parties intended to forfeit the automatic 60-day Basic Extended Reporting Period provided in the Policy in purchasing the 12-month Supplemental Extended Reporting Period.  (Id. at 42.)  Cross motions for summary judgment were filed on December 3, 2012, and responsive memoranda were filed on December 20, 2012.  The FDIC filed a response in opposition to Cincinnati's motion for summary judgment on December 20, 2012.  Further, the Plaintiffs and Cincinnati filed reply briefs on January 3, 2013.  The court held a hearing on January 30, 2013.  This matter is now ripe for decision.

---

[3]The FDIC sent a letter to each of the directors on October 27, 2011, as a "notice of potential claims and/or wrongful acts."  (Compl. ¶ 48.)  The FDIC further indicated that it would "file suit against [the directors] and other former directors of the Bank of Asheville . . . in the next several weeks, as a result of your negligence, gross negligence, and/or breaches of fiduciary duties or other legal duties."  (Id. Ex. 5 (October 27, 2011 Letter).)  The Plaintiffs notified Cincinnati of the October 27, 2011 letters on October 28, 2011.  The Plaintiffs argued at the motion to dismiss hearing that the October 27, 2011 letter was a "claim" as that term is defined in the Policy.  In light of the court's holding discussed more fully below, the court need not address this argument.

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Monahan v. County of Chesterfield, 95 F.3d 1263, 1265 (4th Cir. 1996). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Ballenger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).

### B. Motions for Summary Judgment

Pursuant to the express terms of the Policy, the underlying lawsuit must have been reported during the Policy period or any applicable extended reporting periods. (Compl. Ex. 2A (Policy Part I, Section I - Insuring Agreements, A).) Cincinnati argues that the Plaintiffs'

submission of the underlying lawsuit on December 30, 2011, was not a claim made before the expiration of the extended reporting period. Cincinnati submits that the extended reporting period expired on November 3, 2011, the date listed on the Endorsement. It is undisputed that on December 30, 2011, the Plaintiffs notified Cincinnati of the complaint served in the underlying lawsuit. Specifically, Cincinnati argues that the Endorsement modified the Policy and eliminated or subsumed the 60-day Basic Extended Reporting Period and that the Bank was aware of and consented to this modification. Cincinnati argues that the Endorsement is not ambiguous and that when there is a conflict between the Endorsement and the Policy, the Endorsement controls. In addition, Cincinnati contends that the Plaintiffs' construction of the Endorsement is unreasonable because it ignores the dates in the Endorsement.

### 1. Ambiguity

In construing an insurance Policy, any doubts and ambiguities must be resolved in favor of the insured. Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Associated Scaffolders and Equipment Co., 579 S.E.2d 404, 406 (N.C. Ct. App. 2003). "A provision of the policy is ambiguous if the writing itself leaves the agreement uncertain." Stockton v. N.C. Farm Bureau Mut. Ins. Co., 532 S.E.2d 566, 567 (N.C. Ct. App. 2000). An ambiguity arises in an insurance policy when the language used in the policy is "reasonably susceptible to different constructions." W & J Rives, Inc. v. Kemper Ins. Group, 374 S.E.2d 430, 433 (N.C. Ct. App. 1988). As a general rule, "[a]mbiguities in insurance policies are to be strictly construed against the drafter, the insurance company, and in favor of the insured and coverage since the insurance company prepared the policy and chose the language." West American Ins. Co. v. Tufco Flooring East, 409 S.E.2d 692, 697 (N.C. Ct. App. 1991), overruled on other grounds by Gaston Cnty. Dyeing Mach. Co.

v. Northfield Ins. Co., 524 S.E.2d 558 (2000). In interpreting insurance policies, "[e]xclusions from and exceptions to undertakings by the company are not favored, and are to be strictly construed to provide the coverage which would otherwise be afforded by the Policy." Maddox v. Colonial Life & Accident Ins. Co., 280 S.E.2d 907, 908 (N.C. 1981). "Since the objective of construing an insurance policy is to ascertain the intent of the parties, the courts should resist piecemeal constructions and should, instead, examine each provision in the context of the policy as a whole." DeMent v. Nationwide Mut. Ins. Co., 544 S.E.2d 797, 800 (N.C. 2001).

"An endorsement, even when attached to a policy, is merely part of the contract embodied in the entire policy, which must be construed as a whole." Harleysville Mut. Ins. Co. v. Reliance Nat. Ins. Co., 256 F. Supp. 2d 413, 419 (M.D.N.C. 2002). Cincinnati contends that "[i]f the language of an endorsement conflicts with the general provisions of the policy, the endorsement controls under North Carolina law." (Cincinnati Mem. Supp. Summ. J. 13.) In Harleysville, the District Court for the Middle District of North Carolina noted that "[i]n the event of conflict with policy language, the language of an endorsement generally prevails." 256 F. Supp. 2d at 419. However, North Carolina courts have held that where there is a conflict or ambiguity, the court is required to construe the policy in the construction most favoring the insured. "When an endorsement provision can be construed as in direct conflict with the coverage provisions of the policy, 'the provisions most favorable to the insured . . . are controlling.'" Carlson v. Old Republic Ins. Co., 585 S.E.2d 497, 499 (N.C. Ct. App. 2003) (quoting Drye v. Nationwide Mut. Ins. Co., 487 S.E.2d 148, 150 (N.C. 1997) (finding that the endorsement created an ambiguity and "[g]iven the ambiguity, the policy, as amended by the endorsement, must be construed against defendant")).

> [W]here there is a standardized contract, such as . . . here, and the insured and insurer are in unequal bargaining positions, any exceptions, limitations, or exclusions that may vary from the original policy issued must clearly, conspicuously and unambiguously be called to the insured's attention. Especially where there is a reduction in coverage, the notice must be specific.

N. River Ins. Co. v. Young, 453 S.E.2d 205, 210 (N.C. Ct. App. 1995).

Prior to the end of the Policy Period on November 3, 2010, the Plaintiffs purchased by way of endorsement, a 12-month Supplemental Extended Reporting Period for an additional premium charge of $32,255. The Supplemental Extended Reporting Period Endorsement states in its "Schedule" section that the Supplemental Extended Reporting Period is "11-03-2010 – 11-03-2011." (Compl. Ex. 2A (Policy Endorsement).) The Policy automatically[4] provides, for no additional charge, a 60-day Basic Extended Reporting Period and provides that a 12-month Supplemental Extended Reporting Period may be purchased for an additional fee and by way of endorsement. The Policy specifically provides that the Supplemental Extended Reporting Period begins upon the expiration of the Basic Extended Reporting Period. Thus, based on the

---

[4]In response to the Plaintiffs' motion for summary judgment, Cincinnati argues that the "Policy does not automatically contain an additional 60-day reporting period beyond the November 3, 2010 termination date because the Basic 'Extended Reporting Period' is not necessarily provided." (Cincinnati Mem. Opp'n Summ. J. 4.) Cincinnati cites Part V, Section XVII, Paragraph F of the Policy which states that "Any 'Extended Reporting Period' will immediately terminate on the effective date and hour of any other insurance issued to the 'policy insured' which replaces this insurance. . . ." (Compl. Ex. 2A (Policy).) Cincinnati argues that the Bank purchased insurance from Ironshore Indemnity, Inc. and XL Specialty Insurance Company, which was effective November 3, 2010, to replace the expiring Cincinnati Policy. This is a disingenuous argument at best. The Policy expired November 3, 2010. The supplemental endorsement was for extended reporting coverage not to renew the Policy. As the Plaintiffs point out, they were not able to obtain replacement coverage which did not contain both "prior acts" and regulatory exclusions. Those exclusions "completely exclude coverage under the new policies for any claims brought by the FDIC based on actions taken by the insureds prior to the [issuance] of the new policies on November 3, 2010." (Pls. Reply Supp. Summ. J. 4.)

Policy Period ending date of November 3, 2010, under Section XVIII of the Policy, the reporting period was as follows: 60 days for the Basic Extended Reporting Period plus 12 months for the Supplemental Extended Reporting, which equals January 3, 2012.

The Policy provides that the Endorsement "shall set forth any terms that differ from the basic coverage applicable to the Supplemental 'Extended Reporting Period,'" which is patently ambiguous on its face. (Id. Ex. 2A (Policy, Part V, Section XVIII - Extended Reporting Periods, E).) Notably, this provision does not state that the Endorsement sets forth any different terms applicable to the Basic Extended Reporting Period. In fact, the Endorsement is silent regarding the 60-day Basic Extended Reporting Period. The dates of the Supplemental Extended Reporting Period listed in the schedule, November 3, 2010 to November 3, 2011, fail to account for the 60-day Basic Extended Reporting Period provided automatically upon the expiration of the Policy. However, the Endorsement states that the Supplemental Extended Reporting Period "is provided as described in SECTION XVIII - EXTENDED REPORTING PERIODS of the GENERAL PROVISIONS APPLICABLE TO ALL COVERAGE PARTS FORMING THIS POLICY." (Id. Ex. 2A (Policy Endorsement) (emphasis in original).)

As described in Section XVIII of the Policy, the Supplemental Extended Reporting Period begins after the end of the automatic 60-day Basic Extended Reporting Period. Further, the word "supplemental" indicates that the extended reporting period supplements another reporting period. However, the schedule dates on the Endorsement appear to eliminate the 60-day Basic Extended Reporting Period instead of supplementing it. Notably, other endorsements to the Policy that modify the coverage provided under the Policy clearly state specifically the modification. For example, in the endorsement modifying section XVII of the

Policy, the endorsement states "Item B. is amended by deleting the sentence, 'this policy or any of its Coverage Parts may not be cancelled by us for any reasons except for non-payment of premium when due'." (Compl. Ex. 2A (Policy Amendatory Endorsement).)

In addition, the Endorsement states: "This endorsement modifies insurance provided under the following: Financial Institutions Blue Chip Policy." (Id. Ex. 2A (Policy Endorsement).) Also, the Endorsement notes that "[a]ll other provisions of the Policy remain unchanged except as herein expressly modified." (Id. Ex. 2A (Policy Endorsement) (emphasis added).) The Endorsement did not expressly modify the Basic Extended Reporting Period and the Supplemental Extended Reporting Period is provided in the Endorsement "as described in the Policy." However, the dates in the schedule do not reflect the automatic 60-day Basic Extended Reporting Period, which provides that the 60-day Basic Extended Reporting Period starts "immediately after the end" of the Policy and the 12-month Supplemental Extended Reporting Period "starts when the . . . [60 days] ends."

Although the Policy provided a 60-day Basic Extended Reporting Period automatically, Cincinnati charged the Bank the maximum permitted under the Policy, a 200 percent premium, for 12 months of Supplemental Extended Reporting Period coverage. However, Cincinnati erroneously used the dates November 3, 2010 to November 3, 2011. Thus, under Cincinnati's argument, the Bank paid for 12 months and received only 10 months of additional extended reporting coverage. Based on the foregoing, the court finds that the starting and ending dates of the Endorsement conflict with the terms of the Policy and is ambiguous because it is subject to different interpretations regarding the 60-day Basic Extended Reporting Period and the 12-month Supplemental Extended Reporting Period.

## 2. Intent

Cincinnati contends that "every document and communication made contemporaneously with the purchase of the Supplemental Extended Reporting Period," supports finding that the intent of the parties was to eliminate the 60-day Basic Extended Reporting Period. (Cincinnati Mem. Supp. Summ. J. 14-15.) This is an amazing argument. Why would the Bank forfeit the 60-day Basic Extended Reporting Period when the Policy specifically provides that if the Bank purchases an extended reporting period of 12 months, the 12-month period begins when the 60-day Basic Extended Reporting Period "ends"? (Compl. Ex. 2A (Policy Part V, Section XVIII - Extended Reporting Periods, E).) Cincinnati cites Doughman's representation that he informed Mann by telephone that Cincinnati would not "agree to provide more than a total of twelve months of extended reporting coverage." (Id. Ex. B (Doughman Aff. ¶ 10).) Further, Doughman sent an email offering the 12-month extension with the November 3, 2010 to November 3, 2011 dates. (Id.) Cincinnati argues that the Plaintiffs are deemed to have knowledge of Doughman's representations because Mann was the Plaintiffs' agent. Cincinnati submits that the Endorsement is consistent with this representation because the schedule lists the effective dates of November 3, 2010 to November 3, 2011. (Cincinnati Mem. Supp. Summ. J. Ex. B (Doughman Aff. ¶ 12).) In addition, Cincinnati references all of the documents that include the November 3, 2010 to November 3, 2011 dates and notes that nowhere are the dates January 3, 2011 to January 3, 2012 quoted.

Cincinnati contends that no one ever objected to the dates listed in the schedule and that it repeatedly informed the Bank and the FDIC that the extended reporting period expired on November 3, 2011. Moreover, Cincinnati submits that the Bank benefitted from the

Endorsement because the $3 million aggregate restarted immediately upon expiration of the

Policy. (Cincinnati Mem. Opp'n Summ. J. 18.) Cincinnati submits that:

> Knowing that Cincinnati would not provide more than a total of 12-months of extended reporting, and following receipt of Cincinnati's offer to provide a 12-month extended reporting period effective November 3, 2010 to November 3, 2011, the evidence shows that Mann recognized that the November 3, 2010 to November 3, 2011 reporting period offered by Cincinnati included the 60-day period of the BERP. The evidence also shows that Hall knew the 60-day period of the BERP was included within the November 3, 2010 to November 3, 2011 extended reporting period offered by Cincinnati, since he was advised that Cincinnati would not be providing the extended reporting period he expected to receive. Hall did not question the offer, and has no credible explanation for the November 3, 2011 termination date contained on the offer and in his Board minutes. No board member told Hall they believed there should be an extra 60 days of extended reporting, and the written board minutes show that the board accepted Cincinnati's offer: a 12-month extended reporting period effective November 3, 2010 to November 3, 2011.

(Cincinnati Mem. Opp'n Summ. J. 24.) Cincinnati argues that further evidence that the Bank

knew the 60-day Basic Extended Reporting Period was eliminated and the Supplemental

Extended Reporting Period expired on November 3, 2011, is the fact that the Bank coordinated

its new insurance policy with XL Specialty Insurance Company ("XL Specialty") to remove the

prior bad acts as of November 3, 2011, to coincide with the expiration of the Supplemental

Extended Reporting Period. (Cincinnati Reply Supp. Summ. J. 3-4.)

As an initial matter, Mann was Cincinnati's agent. The Agency Agreement between

Cincinnati and Webb authorizes Webb "as our agent in the territory of Asheville, NC and

vicinity, you may accept and bid contracts of insurance that we are licensed to write" for "all

lines of insurance." (Cincinnati Mem. Opp'n Summ. J. Ex. A (Agency Agreement).) Mann

described the relationship with Cincinnati as a "principal/agent relationship." (Pls. Mem. Supp.

Summ. J. Ex. 5 (Mann Dep. at 91).) However, Cincinnati counters that Webb's authority to

bind was subject to Cincinnati's underwriting rules and practices and that "the decision to accept

a risk and issue a policy and on what terms rested solely with Cincinnati." (Cincinnati Mem.

Opp'n Summ. J. 22.) In addition, Cincinnati contends that Mann did not have the authority to

bind Cincinnati to any extended reporting period coverage and that applications for insurance

were considered and approved solely by Cincinnati. (Id. Ex. B (Doughman Aff. ¶ 5).) Further,

Cincinnati argues that the Plaintiffs admitted that Webb was the Bank's agent in the complaint,

which states that "[t]hrough their insurance agent, the insureds under the Policy purchased a

twelve month Supplemental Extended Reporting Period." (Compl. ¶ 24.)

  N.C. Gen. Stat. § 58-33-20(a) provides that "[e]very agent . . . who solicits or negotiates

an application for insurance of any kind, in any controversy between the insured . . . and the

insurer, is regarded as representing the insurer and not the insured . . . ." In addition, section

58-33-20(b) provides that:

> Every broker who solicits an application for insurance of any kind, in any
> controversy between the insured or his beneficiary and the insurer issuing any
> policy upon such application, is regarded as representing the insured or his
> beneficiary and not the insurer; except any insurer that directly or through its
> agents delivers in this State to any insurance broker a policy of insurance pursuant
> to the application or request of such broker, acting for an insured other than
> himself, is deemed to have authorized such broker to receive on its behalf
> payment of any premium that is due on such policy of insurance at the time of its
> issuance or delivery.

Cincinnati alleges that Webb was a broker. N.C. Gen. Stat. § 58-33-10(1) and (3) defines agent

as "a person licensed to solicit applications for, or to negotiate a policy of, insurance" and

broker as "a person who, being a licensed agent, procures insurance for a party other than

himself through a duly authorized agent of an insurer that is licensed to do business in this State

but for which the broker is not authorized to act as agent." "[K]nowledge of or notice to an

agent of an insurer is imputed to the insurer itself, absent collusion between the agent and the insured." <u>N. Nat'l Life Ins. v. Lacy J. Miller Mach. Co.</u>, 305 S.E.2d 568, 571-572 (N.C. Ct. App. 1983), <u>aff'd</u>, 316 S.E.2d 256 (1984). "Moreover, an insurance company is deemed by law to have notice of facts that an inquiry pursued with ordinary diligence and understanding would have disclosed." <u>Id.</u> at 572.

In <u>Jefferson Pilot Financial Insurance Co. v. Marsh USA, Inc.</u>, the North Carolina Court of Appeals held that even in the absence of an agency agreement, "[t]he record indicates that [the agent] received commissions from Hartford and issued title binders and other documents on [the insurer's] behalf. These actions create, at minimum, apparent authority for [the agent] to act as [the insurer's] agent . . . ." 582 S.E.2d 701, 706 (N.C. Ct. App. 2003). In contrast, there is an agency agreement in this case specifically providing authority to bind to Webb. Furthermore, section 58-33-10(3) provides that a broker is required to work with an agent who in turn works directly with the insurance company in obtaining insurance. Cincinnati conceded at argument that Webb did not utilize another agent and that Webb worked directly with it in negotiating the Endorsement. Thus, Webb was not a broker under section 58-33-10(3). Mann, an employee of Webb, negotiated the extended reporting period directly with Cincinnati, and Webb was a licensed agent of Cincinnati, with some authority to bind according to the agency agreement. Moreover, Webb is paid directly by Cincinnati, and the premium payment is considered the property of Cincinnati. Likewise, Cincinnati's argument that Webb is identified as an independent contractor and thus is not an agent is of no consequence. "An independent contractor may also be an agent." <u>Standard Supply Co., Inc. v. Reliance Ins. Co.</u>, 272 S.E.2d

394, 397 (N.C. Ct. App. 1980).  The court finds that under section 58-33-20(a), Mann was the agent of Cincinnati in negotiating the Supplemental Extended Reporting Period.

There is no evidence in any documentation specifically noting that the 60-day Basic Extended Reporting Period would be eliminated if the Bank elected to purchase the 12-month Supplemental Extended Reporting Period.  Nor is there any record of a discussion that Cincinnati's proposal was materially different from the terms of the Policy.  There is no evidence that anyone from the Bank or Webb consented to subsuming or eliminating the 60-day Basic Extended Reporting Period.  All witnesses from the Bank and Webb testified that they did not understand or intend that the purchase of the 12-month Supplemental Extended Reporting Period would result in the loss of the 60-day Basic Extended Reporting Period.  (Pls. Mem. Supp. Summ. J. 2.)  Hall testified that he intended to purchase the "best and maximum coverage that [the Bank] could afford."  (Id. Ex. 4 (Hall Dep. at 24-25).)  Hall testified as follows:

> I felt those dates were consistent with the way the policy dates had been reflected in the past, and showed continuity of coverage and showed an uninterruption.  The previous policy had the basic extended reporting period of sixty days on it, but the policy did not say, "Expires 01-03-2010," or whatever the date was.  That sixty days, again, whether Cincinnati puts it at the beginning or the tail, was not something I was focusing on.  I knew I had the sixty days, and I was buying twelve additional months.

(Id. Ex. 4 (Hall Dep. 131).)  Further, Hall testified that:

> It's not speaking to that sixty days.  Again, I don't know how they float those dates.  I bought a twelve-month policy.  I paid for twelve months.  I did not pay for ten.  No one provided me with any documentation to the contrary, that I was losing my sixty days.  They did not say, "This policy replaces your existing policy."  This is a supplemental extended reporting endorsement to the existing policy.

(Id. Ex. 4 (Hall Dep. at 133).)  Both Hall and Mann were aware that the Policy provided an automatic 60-day Basic Extended Reporting Period.  It was Mann's understanding that the

12-month Supplemental Extended Reporting Period offered by Cincinnati was in addition to the 60-day Basic Extended Reporting Period provided automatically in the Policy.  (Id. Ex. 5 (Mann Dep. at 33, 39, 118).)  There is no evidence that Cincinnati informed the Bank that by purchasing the 12-month Supplemental Extended Reporting Period coverage that the 60-day Basic Extended Reporting Period provided in the policy was eliminated.

In addition, Cincinnati's argument that the XL Specialty policy's removal of the prior bad acts exclusion from the policy after one year reflects that the Plaintiffs knew that they only had one year of extended reporting coverage from Cincinnati is unsupported by the evidence. To the contrary, the XL Specialty insurance policy removed the prior acts exclusion automatically after 12 months and there is no evidence that the exclusion was specifically negotiated by the Bank.  (Cincinnati Mem. Opp'n Summ. J. Ex. L (October 15, 2010 email).) Tom Havens of U.S. Risk stated in an email to Strong about the prior acts exclusion in the XL Specialty policy that "after 12 months, the prior acts exclusion will automatically be lifted. Thus, effective 11/1/11, your bank's D&O policy will not have a prior acts exclusion – very unique in the market."  (Id. Ex. L (October 15, 2010 email).)

Likewise, Cincinnati's argument that the Plaintiffs benefitted from the Endorsement because they immediately received a new $3 million aggregate upon expiration of the Policy because the Supplemental Extended Reporting Period began on November 3, 2010, is strained. Under the Policy, if a Supplemental Extended Reporting Period is provided, the insured receives a new $3 million aggregate upon the start of the Supplemental Extended Reporting Period. However, the Plaintiffs certainly would not benefit from increasing their liability exposure by eliminating the 60-day Basic Extended Reporting Period in favor of an immediate $3 million

aggregate. There is no genuine issue of material fact that the Plaintiffs intended to eliminate the 60-day Basic Extended Reporting Period that was automatically provided in the Policy. The only inference that can be drawn from the evidence is that the Plaintiffs intended to purchase and paid for a 12-month Supplemental Extended Reporting Period in addition to the 60-day Basic Extended Reporting Period automatically provided for in the Policy.

Further, Cincinnati could not eliminate the automatic 60-day Basic Extended Reporting Period and charge a 200 percent premium for the 12-month extension when the Plaintiffs had already automatically purchased two months of Basic Extended Reporting Period coverage under the Policy. Further, in a September 20, 2010 email, Doughman states that he "understood that NC requires us to offer the 12 month extension if requested by the Insured and we did not have the option to decline that request." (Pls. Mem. Supp. Summ. J. Ex. 10 (email exchange).) Attached to the email is a copy of North Carolina Guidelines which provide that upon nonrenewal, "there shall be a 30-day period after the effective date of the cancellation or nonrenewal during which the insured may elect to obtain an endorsement providing an extended reporting period of at least one year covering non-medical claims." (Id.)

Cincinnati clearly intended to sell the Bank a 12-month Supplemental Extended Reporting Period and charged the Bank for 12 months as reflected by the premium of $32,255, which is equivalent to 200 percent of the annual premium on the Policy. Based on Cincinnati's argument, instead of selling 12 months of extended coverage, which the Bank purchased, Cincinnati only sold 10 months of extended coverage to the Bank because it eliminated or subsumed the 60-day Basic Extended Reporting Period that was provided automatically with Policy. Cincinnati's argument amounts to an admission that it violated the terms of the Policy.

In addition, in a November 6, 2000 letter to the Bank and Weststar outlining renewal of a previous Policy period, Doughman described the "Blue Chip Policy enhancements" in part as follows: "Free 60 Day Extended Reporting Provision (additional 12 months available)." (Pls. Mem. Supp. Summ. J. Ex. 3 (November 6, 2000 Letter).) Thus, to market this insurance to the Bank, Doughman touted the free 60-day Basic Extended Reporting Period and "additional" 12-month Supplemental Extended Reporting Period. However, Doughman now conveniently states that he informed Mann that Cincinnati would provide no more than a total of a 12-month extended reporting period despite the fact that, surprisingly, there is no documentary evidence that reflects Cincinnati's allegedly calculated decision to eliminate or subsume the 60-day Basic Extended Reporting Period.

Insurance policies can be reformed when the policy as written does not express the intent of the parties. "It is well settled that insurance policies can be reformed for mutual mistake, inadvertence, or the mistake of one induced by the fraud or inequitable conduct of another." Cobb v. Pennsylvania Life Ins. Co., 715 S.E.2d 541, 552 (N.C. Ct. App. 2011). The Plaintiffs cite Gaston-Lincoln Transit, Inc. v. Maryland Cas. Co., 201 S.E.2d 216 (N.C. Ct. App. 1973), in which the North Carolina Court of Appeals held

> that in the renewal of an insurance contract, absent notice to the contrary, the insured has a right to expect that the coverage of the new Policy will be substantially the same as that afforded by its predecessor. If, absent notice to the contrary, the insurer inserts an endorsement varying the original coverage, the renewal contract may be reformed to conform with the terms of the prior Policy. Recovery may be had in that same action by the insured under the renewal contract as reformed.

Id. at 223. Cincinnati argues that Gaston-Lincoln does not apply because the instant case does not involve the renewal of a policy and "[t]he Bank, as a matter of law, c[an]not rely on the

21

assumption that the SERP Endorsement will be on the same terms as the Policy." (Cincinnati

Mem. Opp'n Summ. J. 28.) The Plaintiffs argue and the court agrees that

> the conduct of Cincinnati caused the improper expression of the parties' intent in
> the SERP endorsement. Cincinnati never told Webb or Hall that the automatic
> 60-day BERP would be subsumed in the supplemental period purchased, in
> conflict with the Policy's terms. Instead, Cincinnati (if it intended to subsume the
> 60-day BERP) acted in a manner which lulled the insureds into believing that they
> had purchased the 12-month SERP provided in the policy.

(Pls. Mem. Supp. Summ. J. 19.) Cincinnati had an obligation to specifically notify the Bank

that the Supplemental Extended Reporting Period Endorsement was materially altering the

Policy, which Cincinnati clearly failed to do. Cincinnati's conduct in this case is inequitable and

its arguments approach frivolousness.

Based on the foregoing, the court construes the Policy in favor of the Plaintiffs, the

insureds under the Policy. The evidence is clear that the Plaintiffs did not know or intend to

forfeit the 60-day Basic Extended Reporting Period. To the contrary, the only inference that can

be drawn from the evidence is that the Plaintiffs paid for 14 months of extended reporting

coverage, which includes the 60-day Basic Extended Reporting Period and the 12-month

Supplemental Extended Reporting Period. Thus, the Policy is construed to include the 60-day

Basic Extended Reporting Period in addition to the 12-month Supplemental Extended Reporting

Period. To the extent the Policy requires reformation, the court reforms the dates in the schedule

to read "1-3-2011 – 1-3-2012."

### 3. Declaratory Judgment

Finally, and in light of the foregoing, the court declares that the Plaintiffs timely notified Cincinnati of the "claim" in the underlying lawsuit on December 30, 2011, prior to the expiration of the extended reporting period on January 3, 2012.[5]

Therefore, it is

**ORDERED** that Plaintiffs' motion for summary judgment, docket number 33, is granted.  It is further

**ORDERED** that Cincinnati's motion for summary judgment, docket number 35, is denied.

**IT IS SO ORDERED.**

> s/Henry M. Herlong, Jr.
> Senior United States District Judge

Greenville, South Carolina
February 5, 2013

---

[5]In addition, Cincinnati raises additional arguments in its motion for summary judgment that it raised at the motion to dismiss stage (that the FDIC letters to the Plaintiffs do not constitute a claim and the <u>Deerborne, LLC v. First Bank</u> lawsuit is not causally connected to the FDIC lawsuit).  However, having found that the Plaintiffs are entitled to summary judgment, the court need not consider those arguments.  (Cincinnati Mem. Supp. Summ. J. 19-25.)